## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| KNOSSOS GLOBAL SYSTEMS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> BLACKBERRY LIMITED, <br><br> Defendant. | Civil Action No. 2:25-cv-01177-JRG-RSP <br><br><br> JURY TRIAL DEMANDED |

**PLAINTIFF KNOSSOS GLOBAL SYSTEMS, LLC'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS UNDER 35 U.S.C. § 101**

Knossos Global Systems, LLC ("Knossos") submits this Opposition to BlackBerry Limited's ("BlackBerry" or "Defendant") Motion to Dismiss the First Amended Complaint (Dkt. No. 18; the "FAC") Pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 22; the "Motion"), which asks the Court to invalidate U.S. Patent No. 8,819,410 (the "Asserted Patent" or "'410 patent") under 35 U.S.C. § 101. As detailed herein, the Motion should be denied.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION.................................................................................................................. 1

ARGUMENT......................................................................................................................... 2

    I.    THE ASSERTED CLAIMS ARE DIRECTED TO A SPECIFIC TECHNICAL
        IMPROVEMENT IN ELECTRONIC MESSAGING ARCHITECTURE, NOT TO
        AN ABSTRACT IDEA ................................................................................................. 2

        A.    BlackBerry Describes the Claims at an Impermissibly High Level
               of Abstraction.......................................................................................... 2

        B.    The Claims Are Directed to a Concrete Technical Architecture
               That Leverage Specific Network Routing Mechanics................................... 2

        C.    The Claims Recite Specific Technical Means, Not Functional End-
               Results........................................................................................................ 4

        D.    *Enfish*, *BASCOM*, *McRO*, *Ancora*, *Finjan*, and *SRI Int'l* Confirm
               Patent Eligibility .................................................................................... 5

        E.    BlackBerry's Cases Are Distinguishable............................................... 8

        F.    Claim Construction Should Precede Any Dismissal, and Leave to
               Amend Should Be Granted in the Alternative................................................... 9

        G.    Claim 1 Is Not Representative of the Asserted Claims ................................ 11

    II.    EVEN IF THE CLAIMS WERE DIRECTED TO AN ABSTRACT IDEA, THEY
        CONTAIN AN INVENTIVE CONCEPT SUFFICIENT TO SATISFY *ALICE* STEP
        TWO ........................................................................................................................ 14

        A.    The Claims of the ''410 Patent Describe An Inventive Concept
               Beyond the Alleged Abstract Idea Itself........................................................... 14

        B.    The Per-Message Unique Symmetric Key Rule Is a Non-
               Conventional Architectural Constraint............................................................. 14

        C.    The Per-Recipient Security Package Architecture Is an
               Unconventional Structural Element ................................................................ 15

        D.    The Private Routing Architecture Is a Non-Conventional
               Network Element ........................................................................................ 16

        E.    The Ordered Combination of All Claimed Elements Supplies an
               Independent Inventive Concept ...................................................................... 17

        F.    *Berkheimer* Independently Bars Resolution of the Step Two
               Factual Questions on a Motion to Dismiss ...................................................... 18

CONCLUSION ................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014) ............................................................. 14

*Ancora Technologies, Inc. v. HTC America, Inc.*, 908 F.3d 1343 (Fed. Cir. 2018) ............. 6, 7, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 19

*BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) ............................................................................................................................ passim

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018) ............................................................ passim

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014) ......................................................................................................................... 13

*Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) ................................ 5, 8

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) ..................................... 2, 3, 5, 20

*Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299 (Fed. Cir. 2018) ....................................... 7, 20

*Glasswall Sols., Ltd. v. Clearswift Ltd.*, 754 F. App'x 996 (Fed. Cir. 2018) ............................. 8, 9

*Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) .......................... 8

*Jawbone Innovations, LLC v. Panasonic Holdings Corp.*, No. 2:23-CV-00081-JRG-RSP, 2024 U.S. Dist. LEXIS 58584 (E.D. Tex. Mar. 7, 2024) ............................................ 11

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016) ............. 2, 5, 6, 20

*MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373 (Fed. Cir. 2019) ...................................................... 11

*SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018) ................................................. 7

*Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017) ................. 8

*SRI Int'l, Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295 (Fed. Cir. 2019) .................................... 7, 20

*Symbology Innovations, LLC v. Dexcom, Inc.*, 742 F.Supp.3d 702 (E.D. Tex. 2024) ................. 10

*Torus Ventures LLC v. Cawley Partners, LLC*, , No. 2:24-CV-00552-JRG, 2025 U.S. Dist. LEXIS 123392, 2025 WL 1799327 (E.D. Tex. June 30, 2025) ........................... 8, 9, 16

*Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355 (Fed. Cir. 2023) ................................ 10

**Statutes**

35 U.S.C. §101 ................................................................................................................................. 1

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 6, 10, 14, 19

## INTRODUCTION

By their very nature, early Section 101 motions challenging eligibility for patenting under 35 U.S.C. §101 present a danger that a court will be persuaded to dismiss a case prior to fully understanding the patents, resolving disputes as to the meaning of claim terms, hearing evidence on the state of the technology at the time of the invention, or determining what factual issues must be resolved by a jury. Those very dangers are present here, where Defendant attempts to mischaracterize the inventions in the Asserted Patent as mere abstract ideas while ignoring three fundamental issues that must first be addressed: Claim construction; expert discovery on the state of the art; and the universe of asserted claims (to know whether the exemplar claims used by BlackBerry are actually representative). The fact is that none of the claims of the Asserted Patent are drawn to abstract ideas—instead, the '410 patent claims a specific and novel technical architecture. The claims detail methods for implementing a server-associated private-domain messaging architecture that governs routing and access to electronic information, including through address structures that are not publicly routable on the Internet using per-message unique symmetric encryption keys and per-recipient public-key-protected security packages. The claimed methods solve a technical problem in network infrastructure because they are directed to concrete ways to improve the security and function of communications systems as they existed in 2004, and as explained and detailed by the specifications of the Asserted Patent itself.

Even if that did not preclude a finding of patent ineligibility (and it does), the FAC'a allegations make it clear that the elements of each claim, both individually and as an ordered combination, do not reflect the routine or conventional use of then existing technology, but instead, were unknown in the art at the priority date and directed to inventive concepts. The Motion should be denied for these reasons, as more fully described below.

**ARGUMENT**

I.   **THE ASSERTED CLAIMS ARE DIRECTED TO A SPECIFIC TECHNICAL IMPROVEMENT IN ELECTRONIC MESSAGING ARCHITECTURE, NOT TO AN ABSTRACT IDEA**

**A.   BlackBerry Describes the Claims at an Impermissibly High Level of Abstraction**

BlackBerry's motion rests on a foundational error: it characterizes the claims at an impermissibly high level of abstraction, substituting "sending and managing private electronic communications" for what the claims actually recite. *See, e.g.*, Mot. at 1. The Federal Circuit has squarely condemned this methodology. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) (warning that describing claims "at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule").

BlackBerry's formulation could describe a telephone call, a sealed letter, or a private telegram — none of which bears any technical resemblance to the '410 patent.  The correct inquiry asks whether the claims "focus on a specific means or method that improves the relevant technology" rather than on "a result or effect that itself is the abstract idea." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016).  When that inquiry is applied to what the claims actually recite, it is apparent the '410 patent is directed to a specific technical architecture, not to an abstract concept.

**B.   The Claims Are Directed to a Concrete Technical Architecture That Leverage Specific Network Routing Mechanics**

The '410 patent identifies and provides a solution for a specific technical deficiency in Internet messaging systems as they existed in 2004.  *See* FAC ¶¶ 25-28.  Specifically, standard email address formats were structurally routable by anyone on the Internet because the open Internet's Domain Name System resolves any address that conforms to a registered top-level domain.  *Id.* at ¶26.  As detailed in the FAC, conventional electronic mail systems, including those employing encryption, "remained architecturally exposed because email addresses were publicly

routable and mutable on the open Internet leading to exposure to spam, viruses, and fraud." FAC ¶26; *see also* ¶¶25–28 (describing prior art approaches and their specific technical limitations). Conventional encryption solutions of the era addressed only message *content*—leaving email addresses and routing information fully exposed to the public network. '410 patent at 1:55–60 ("None of these solutions make anything other than the content private").

The '410 patent's solution is not "privacy" as an abstract goal. Rather, he specification describes using a private domain transmission architecture implemented in a variety of technical ways within a server-associated private domain. FAC ¶ 29. These technical solutions include using a private domain address to route information over a private domain within "electronic networks such as the Internet," using a "variety of encryption techniques" such as "RSA technologies" and "PGP (pretty good privacy) key pairs" to "encode private routing information within a private domain," using email addresses that are "not standard email addresses used in the public accessible network," and an "apparatus for performing the operations" described by the patent. *Id*. (citing '410 patent at 4:9-14, 4:19-23, 4:62-5:29)..

An example of such a solution is through the use of PTLDs. *See, e.g.*, FAC ¶ 38, *see also* '410 patent, claim 7. Because industry-governing bodies register and control all standard TLDs, and the PTLD is deliberately outside that registered set, the routing equipment and domain name servers of the open Internet will affirmatively fail to resolve the address—denying it access to the public network regardless of whether it is publicly known. '410 Patent at 10:1-20. The address does not merely say it is private; it is structurally private by operation of how the message is routed.

This technical architecture is directly analogous to claims the Federal Circuit held patent-eligible in *Enfish*, where claims directed to a self-referential database table were not abstract because they were "directed to a specific improvement to the way computers operate." 822 F.3d

at 1336. The '410 patent's server-associated private domain architecture, as recited in the claims, falls in the same category. It does not merely use the Internet to achieve privacy; it modifies *how* routing works at the network infrastructure level to create a domain that is definitionally inaccessible from outside its boundaries.

### C. The Claims Recite Specific Technical Means, Not Functional End-Results

BlackBerry argues the claims are "drafted entirely in functional, result-oriented terms." Mot. at 10-11. This mischaracterizes the claim language. Claim 1 does not simply say "encrypt a message" and "send it privately." It recites a layered cryptographic architecture with four distinct structural elements, each of which corresponds to specific technical mechanisms detailed in the FAC. FAC ¶¶34, 40-41, 50-52 (mapping each claim limitation to specific specification disclosures and figures). The '410 patent walks through the entire transmission process step by step, from the sender pressing "Send" through SMTP proxy initialization, server-side authentication and membership verification, symmetric key generation and document encryption, per-recipient security package formation, and server-hosted storage and retrieval. FAC ¶¶40-43 (explaining Figs. 6 and 7 at the level of individual processing blocks). These are not "functional" recitations of desired results; as seen below, they are specific technical operations performed in a defined sequence by identified components.

*First*, a symmetric cryptographic key that is *unique for each individual transmission* — not reused across messages, but created specifically for the particular communication being sent. '410 patent, claim 1; 7:27-35. *Second*, at least a portion of the electronic information is encrypted by that unique symmetric key. *Id.* at 7:35-42. *Third*, a security package is generated containing the symmetric key encrypted specifically using the *recipient's public cryptographic key*, ensuring only the holder of the corresponding private key can recover the symmetric key and decrypt the message. *Id.* at 7:43-50. *Fourth*, the entire apparatus operates over a private routing

---

infrastructure—a private domain accessible only through servers that understand the address format. *Id.*, claims 1, 6, 7; 9:63-10:20.

This is not the functional claiming condemned in *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016), where claims merely recited "collecting information, analyzing it, and displaying certain results" without specifying *how* any step was performed. The claims of the '410 patent specify exactly *how* to achieve the results: per-message unique keys, public-key-encrypted key packages, private-domain routing through private domain addresses. The distinction between specifying means and merely claiming results is dispositive. *McRO*, 837 F.3d at 1315 ("The claims here are not directed to a specific, unconventional technological solution … to a technological problem.").

### D. *Enfish*, *BASCOM*, *McRO, Ancora, Finjan*, and *SRI Int'l* Confirm Patent Eligibility

Three Federal Circuit decisions BlackBerry does not cite compel denial of the motion. Three additional decisions in the computer-security domain independently reinforce this conclusion. In *Enfish*, the court held that claims directed to a specific improvement in how computers operate—there, a self-referential database table—are patent-eligible. 822 F.3d at 1336. The key question is whether the claims "focus on the specific asserted improvement in computer capabilities … or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1335-36. The '410 patent's claims focus on a specific improvement to how electronic messages are routed—not on the concept of privacy for which computers are a mere tool.

In *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016), the court found claims patent-eligible at Step One where they were directed to installation of a filtering tool at a specific network location with the ability to identify individual

---

**PLAINTIFF KNOSSOS GLOBAL SYSTEMS, LLC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER 35 U.S.C. § 101**
E.D. Tex. No. 2:25-cv-01177-JRG-RSP — Page |5

accounts and configure the filter for each — "a technical improvement over prior art ways" of Internet content filtering. The '410 patent presents a directly analogous scenario: a private-domain server at a specific location intermediate to the communication path, identifying recipient membership and configuring a per-recipient security package accordingly.

In *McRO*, the court held claims patent-eligible where they applied specific rules in a process designed to achieve an improved technological result in conventional industry practice. *See* 837 F.3d at 1315. The '410 patent applies specific rules—private server routing, private addressing (such as PTLD-based addresses), per-message symmetric keys, per-recipient public-key-wrapped key packages—in a process specifically designed to achieve an improved technological result: structural prevention of unauthorized routing of private addresses over the public Internet.

In *Ancora Technologies, Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1348-49 (Fed. Cir. 2018), the Federal Circuit reversed a Fed. R. Civ. P. 12(b)(6) dismissal of claims directed to a method of improving computer security by storing a verification structure in a specific, previously unused location—the BIOS memory. The court held that the claims recited "a concrete assignment of specified functions among a computer's components to improve computer security," and that "[i]mproving security— here, against a computer's unauthorized use of a program—can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Id.* at 1344, 1348-49. The parallel to the '410 patent is direct. Just as *Ancora*'s claims moved a verification structure to a specific hardware location (BIOS) not previously used for that security purpose, the '410 patent moves electronic messaging to a specific network-infrastructure location, private domain transmission architecture, not previously used for secure message routing. Both patents address a technological

vulnerability (hacking of license keys in *Ancora*; public routability of email addresses here) with a specific structural technique that departs from prior approaches, yielding a tangible security benefit that exists because of how the claimed components interact. The '410 patent's claims have the "specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." *Id.* at 1349 (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018)).

In *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303-05 (Fed. Cir. 2018), the court held patent-eligible claims directed to generating a "security profile" that identified potentially hostile code in a downloadable and attaching that profile to the downloadable itself. The court found this was not merely the abstract idea of "virus screening" but a specific technical advance: a new type of data structure (the security profile) that "enables a computer security system to do things it could not do before." *Id.* at 1304. The '410 patent's "security package", containing a per-message symmetric key encrypted with the recipient's public key, is an analogous data structure. Like the security profile in *Finjan*, the security package is a specifically defined technical construct with a particular composition, created through specific steps, that enables capabilities the prior art did not provide—namely, per-recipient cryptographic binding of a per-message key within a private-domain routing architecture. The claims "recite more than a mere result" and instead specify "specific steps" for accomplishing the security objective. *See id.* at 1305.

Finally, in *SRI Int'l, Inc. v. Cisco Systems, Inc.*, 930 F.3d 1295, 1300-03 (Fed. Cir. 2019), the Federal Circuit held patent-eligible claims directed to network intrusion detection using deployed network monitors that analyzed network packets and generated hierarchical reports of suspicious activity. The court distinguished *Electric Power Grp.* — one of BlackBerry's principal

authorities by observing that those claims "were drawn to using computers as tools to solve a power grid problem, rather than improving the functionality of computers and computer networks themselves." *Id.* at 1301 (citing *Electric Power Grp.*, 830 F.3d at 1354). The court concluded that the claims recited "a specific technique for improving computer network security" that was patent-eligible at Step One. *Id.* at 1302. The same reasoning applies here. The '410 patent's claims do not use a generic computer to solve a non-computer problem; they recite a specific technique— private-domain routing combined with per-message, per-recipient hybrid cryptography—that improves the security and functionality of electronic messaging networks themselves.

### E.  BlackBerry's Cases Are Distinguishable

In support of its argument for *Alice* Step One, BlackBerry relies on *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016); *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017); *Glasswall Sols., Ltd. v. Clearswift Ltd.*, 754 F. App'x 996 (Fed. Cir. 2018); and *Torus Ventures LLC v. Cawley Partners, LLC*, , No. 2:24-CV-00552-JRG, 2025 U.S. Dist. LEXIS 123392, 2025 WL 1799327 (E.D. Tex. June 30, 2025). Each is materially distinguishable.

In *Intellectual Ventures I v. Symantec*, the claims recited only *what* to do (screen messages; filter based on content) without specifying *how*. 838 F.3d at 1315. The '410 patent's claims specify *how*: private domain transmission architecture which uses addresses structurally excluded from Internet routing, per-message unique symmetric keys, and per-recipient public-key-encrypted security packages.

In *Secured Mail*, the court found no "special rules or details of the computers, databases, printers, or scanners" recited. 873 F.3d at 910. By contrast, claim 1 here specifies the security package's composition (a copy of the symmetric key encrypted with the recipient's public key)

and the decryption mechanism (recipient uses private key to recover symmetric key, then decrypts document). These are specific details, not bare functional recitations.

In *Glasswall*, the court found claims abstract where they were "framed in wholly functional terms, with no indication that any of these steps are implemented in anything but a conventional way." 754 F. App'x at 998. By contrast, the '410 patent recites a specific technical architecture for electronic messaging, including server-mediated private-domain routing and transmission-specific cryptographic packaging using per-message symmetric keys and per-recipient public-key-protected security packages. These concrete structural mechanisms are precisely the kind of concrete structural implementation that *Glasswall* found missing.

In *Torus Ventures*, this Court held claims abstract where they recited "protecting, encrypting, and associating data" using an algorithm without providing "any specific method of how the bit streams are encrypted or how the encrypted data is associated with its decryption algorithm." 2025 U.S. Dist. LEXIS 123392 at *15, 2025 WL 1799327 at *5. That holding only confirms Knossos's position because, unlike the patent at issue in *Torus*, **claim 1 of the '410 patent** **<u>does recite the specific method</u>**. The decryption mechanism is fully specified: the recipient uses their private key to decrypt the security package and recover the symmetric key, then uses the symmetric key to decrypt the document. '410 patent, claim 1; Fig. 7, Steps 715-717. *Torus Ventures* stands for the proposition that claims lacking specific methods are abstract, not that claims containing specific methods are abstract.

### F. Claim Construction Should Precede Any Dismissal, and Leave to Amend Should Be Granted in the Alternative

BlackBerry acknowledges the parties disagree about whether claim construction is needed before resolution of this motion. Dkt. 17 at 1; Dkt. 22 at 16 n.2. That disagreement is significant. The scope and technical character of terms like "private domain," "security package," and "private

routing address" bear directly on whether the claims recite a specific technical architecture or merely the abstract concept of private messaging. BlackBerry's entire Step One argument depends on characterizing these terms at maximum generality and treating "private domain" as synonymous with "closed group" and "security package" as synonymous with "encryption." But the specification describes a "private domain" as a server-associated network domain that governs routing and access to electronic information, including through address structures that are not publicly routable on the open Internet, for example, through the use of a PTLD. '410 patent at 5:10-21; 10:8-20. It describes a "security package" as a specifically composed data structure containing the transmission-specific symmetric key encrypted with the recipient's public key. *Id*. at 8:43-53. Whether those terms are interpreted narrowly, consistent with the specification, or broadly, in the manner BlackBerry assumes, directly determines whether the claims recite a network-infrastructure modification or a generic abstraction. The Court should resolve this ambiguity through claim construction before terminating Knossos's patent rights on a Rule 12(b)(6) motion.

BlackBerry relies on *Symbology Innovations, LLC v. Dexcom, Inc.*, 742 F.Supp.3d 702, 708 (E.D. Tex. 2024), and *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1360-61 (Fed. Cir. 2023), for the proposition that a patentee must identify specific terms and propose constructions to justify deferral. Dkt. 17 at 2-3. But those cases are distinguishable. In both, the "basic character of the claimed subject matter" was "clearly evident" because the patents recited straightforward business methods implemented on generic hardware. *See Symbology Innovations*, 742 F.Supp.3d at 712; *Trinity Info Media*, 72 F.4th at 1361-63. Here, by contrast, the parties fundamentally disagree about the technical character of the claims. BlackBerry characterizes them as "sending and managing private electronic communications using conventional encryption,"

Mot. at 1, while Knossos's FAC—supported by detailed claim-to-specification mapping tables spanning five pages (FAC ¶¶51-52)—alleges the claims recite "a specific server-associated private-domain transmission architecture that implements structured routing, membership gating, and transmission-specific cryptographic packaging." FAC ¶53. That disagreement about the "basic character" of the claims is precisely the kind of dispute that claim construction exists to resolve. The Federal Circuit reversed a § 101 dismissal on exactly this basis in *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379-80 (Fed. Cir. 2019); *see also Jawbone Innovations, LLC v. Panasonic Holdings Corp.*, No. 2:23-CV-00081-JRG-RSP, 2024 U.S. Dist. LEXIS 58584, *5 (E.D. Tex. Mar. 7, 2024) (denying § 101 motion to dismiss where claim construction was necessary).

Notably, BlackBerry itself intends to seek claim construction later in this case — just not before the Court decides its dispositive motion. In the parties' Joint Position (Dkt. 17), BlackBerry acknowledged that it may decide to seek claim construction later in the case while arguing that construction is unnecessary for § 101 purposes. Dkt. 17 at 2-3. That position is internally inconsistent. If claim scope matters enough to warrant formal construction for infringement purposes, it matters equally for eligibility. Both inquiries depend on the same question: what do the claims actually cover? BlackBerry's motion asks this Court to answer that question against Knossos while simultaneously deferring the very process designed to answer it. *See Jawbone Innovations*, 2024 U.S. Dist. LEXIS 58584 at *5 (denying § 101 motion to dismiss where claim construction was necessary).

### G.   Claim 1 Is Not Representative of the Asserted Claims

BlackBerry's motion rests on the premise that claim 1 is representative of all twenty claims of the '410 patent. Mot. at 4-6. It is not. The dependent claims recite materially different routing structures, database-management operations, conditional transmission logic, and server-mediated

control mechanisms that impose additional architectural constraints beyond those in claim 1 and define distinct operational behaviors within the private-domain transmission system.  FAC ¶49. Under *Berkheimer*, a claim is representative only when there is no "meaningful argument for the distinctive significance of any claim limitations not found in the representative claim." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).  Here, meaningful distinctions abound.

Claims 5-7, for example, specify structural requirements for the private routing address that are entirely absent from claim 1.  Claim 5 requires the address format to contain characters discretionarily selectable by an administrator of the private domain.  Claim 6 adds a two-part address structure in which the first portion is compatible with a public domain and publicly routable, while the second portion is routable only within the private domain, and the address as a whole is not routable on the public Internet.  Claim 7 requires a private top level domain ("PTLD")—the specific mechanism by which the '410 patent can exploit the domain registration framework to render addresses structurally non-routable.  '410 patent, claims 5-7; FAC ¶48.  These are not minor elaborations; they define part of the very address-level infrastructure that distinguishes the '410 patent from generic encrypted messaging.  A § 101 analysis that ignores the private domain mechanism and the two-part address structure is fundamentally incomplete.

Claim 9 recites conditional routing logic in which electronic information may be transmitted using publicly routable addresses without modifying the content when the recipient address is not a private routing address—thereby defining different routing behavior based on address type.  Claim 10 further requires server-mediated storage and retrieval when the recipient address is a private routing address, mandating that the electronic information be transmitted to and retrievable from the server associated with the private domain.

Claim 15 adds a distinct database-management mechanism: when a recipient is not a member of the private domain, the server creates a temporary entry to allow the recipient to obtain software and retrieve the electronic information without requiring the sender to retransmit it. FAC ¶48. Each of these claims imposes routing, database, and transmission-control constraints that are not present in claim 1 and that alter the § 101 analysis by introducing additional concrete technical operations that further remove the claims from any purported abstract idea.

BlackBerry dismisses these differences as "routine and conventional limitations" that "merely append" to claim 1. Mot. at 5. But whether a limitation is conventional is a factual question under *Berkheimer*, and BlackBerry offers no evidence—no prior art, no expert testimony, no technical publication—establishing that private domain-based addressing, conditional routing based on address type, or server-side temporary-entry creation for non-member recipients were conventional features of electronic messaging systems as of 2004. The question under *Alice* is not merely whether claims differ in their functional details, but whether any additional element supplies an inventive concept beyond the abstract idea. Because the dependent claims recite concrete technical operations that are materially different from claim 1 and that independently bear on both the Step One and Step Two analyses, claim 1 cannot be treated as representative. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (representative treatment appropriate only where claims are "substantially similar and linked to the same" ineligible concept). At a minimum, each asserted dependent claim must be analyzed on its own terms before the Court can determine whether it is patent-eligible.

## II. EVEN IF THE CLAIMS WERE DIRECTED TO AN ABSTRACT IDEA, THEY CONTAIN AN INVENTIVE CONCEPT SUFFICIENT TO SATISFY *ALICE* STEP TWO

### A. The Claims of the ''410 Patent Describe An Inventive Concept Beyond the Alleged Abstract Idea Itself

Under *Alice* Step Two, a court asks whether the claims contain an "inventive concept"—an element or combination of elements sufficient to ensure the patent amounts to "significantly more than a patent upon the [ineligible concept] itself." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014).  An inventive concept may reside in a single unconventional element, or in the "non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*, 827 F.3d at 1341, 1350.  Critically, whether the elements were well-understood, routine, and conventional at the time of invention is a *question of fact* that cannot be resolved against the patentee on a Rule 12(b)(6) motion absent clear intrinsic-record evidence establishing conventionality.  *Berkheimer*, 881 F.3d at 1368–69.  BlackBerry bears the burden of establishing conventionality by clear and convincing evidence.  *Id.* at 1368.  It has not met that burden.

### B. The Per-Message Unique Symmetric Key Rule Is a Non-Conventional Architectural Constraint

The '410 patent addresses limitations of prior encrypted messaging systems by imposing a specific architectural rule, expressly recited in claim 18 and reflected in claim 1: a new symmetric cryptographic key is generated for *each individual message transmission*, such that no two messages share a key.  '410 patent at 7:27-35; claim 18.  This per-message key generation is not merely an instruction to "encrypt using standard tools" as BlackBerry suggests.  It is a system-level architectural constraint that limits any key compromise to a single communication.

BlackBerry's only support for the claim that per-message key generation was "conventional" is the specification's statement that "a variety of encryption techniques" may be used.  Mot. at 13.  That statement addresses the *type* of encryption algorithm, not whether per-

message key generation as a structural constraint was a standard feature of commercially deployed email encryption systems as of 2004. BlackBerry has offered no extrinsic evidence—no prior art, no expert testimony, no contemporaneous technical publication establishing that it was a standard feature in 2004. That factual gap precludes dismissal under *Berkheimer*, 881 F.3d at 1369.

## C. The Per-Recipient Security Package Architecture Is an Unconventional Structural Element

Claim 1 recites a "security package" with a specific composition: an encrypted copy of the per-message symmetric key, where encryption is performed using *the individual recipient's public cryptographic key*, so that only the holder of the corresponding private key can recover the symmetric key and decrypt the message. '410 patent, claim 1. In a multi-recipient transmission, each recipient receives a *uniquely* encrypted copy of the same symmetric key, calibrated to that recipient's own public key. *Id.* at 7:43-50; 12:30-40; Fig. 6, Block 618. This per-recipient binding ensures that no recipient can use their security package to decrypt another recipient's copy of the key.

BlackBerry gestures at RSA and PGP as prior art for public-key encryption. Mot. at 12. But that *PGP existed* does not mean the *specific combination*—per-message unique symmetric key wrapped per-recipient in that recipient's public key, stored on a private-domain server, and accessible only through a private domain address—was a conventional commercial architecture in 2004. The Federal Circuit in *BASCOM* expressly held that the inventive concept inquiry asks whether the *arrangement* of known pieces was conventional, not whether the pieces themselves were known. 827 F.3d at 1350. BlackBerry has produced no evidence that this specific arrangement was conventional.

---

### D.  The Private Routing Architecture Is a Non-Conventional Network Element

Even if the '410 patent was directed merely to the abstract idea of "private messaging" (and it is not), the private routing architecture is an inventive concept that transforms that idea into patent-eligible subject matter.  The private routing mechanism does not implement privacy using generic computers in a generic way; it creates a new category of network address—simultaneously public-facing and structurally non-routable over the public Internet—by exploiting a specific gap in the Internet's domain registration framework.  '410 patent, claims 6-7; 10:1-20.  Standard domain resolvers will affirmatively fail to resolve the address, not because it is unlisted, but because the private routing is architecturally outside the registered namespace.

This Court's analysis in *Torus Ventures* confirms the distinction.  Claims were held to lack an inventive concept there because they recited "generic computer parts and conventional methods" without any specific technical mechanism.  2025 U.S. Dist. LEXIS 123392 at *23-25, 2025 WL 1799327 at *7-9.  The private routing address format is not a generic computer part, and the rule that the address is excluded from the Internet's domain registration set is not a conventional networking method.  It is a specific structural choice that exploits a concrete property of network infrastructure in an unconventional way.

The Federal Circuit's decision in *BASCOM* is also instructive.  The inventive concept there was "the installation of a filtering tool at a specific location, remote from the end-users" with the ability to identify individual accounts and configure the filter for each.  827 F.3d at 1350.  Each component was individually known.  But their *specific structural configuration* created an inventive concept.  The same logic applies here: the placement of a private-domain server that understands private routing addresses, at a specific position in the communication path, implementing per-message per-recipient cryptographic binding, constitutes a non-conventional and non-generic arrangement sufficient for Step Two.

### E.  The Ordered Combination of All Claimed Elements Supplies an Independent Inventive Concept

Even if each element were treated as individually conventional, which BlackBerry has not established, the ordered combination of the claimed elements creates an inventive concept.  The '410 patent combines: (1) a private domain-based address structurally non-routable on the open Internet; (2) a private-domain server that bridges public and private routing; (3) per-message unique symmetric key generation; (4) per-recipient public-key-wrapped security packages; and (5) transparent integration with existing email clients through an add-in layer requiring no behavioral change from users.  '410 patent at 9:1-45.

No conventional email encryption architecture as of 2004 combined all five elements.  FAC ¶60 ("No prior systems combined registration-based participation controls, server-mediated membership determination, Internet-unroutable private routing addresses, transmission-specific symmetric key generation, formation of security packages using recipient-specific public keys, and server-hosted storage and retrieval operations in the manner recited in the claims.").  "Pull emails systems" required users to send and receive emails via a particular server farm, requiring the user to log in and have a recipient in the system.  FAC ¶ 27.  "Push email systems" used email clients to send and receive emails, but the email addresses would then become public.  FAC ¶¶ 27-28 (describing these prior approaches and their limitations).  None created a PTLD-based domain making addresses simultaneously public and Internet-non-routable.  The combination in the '410 Patent is the "non-conventional and non-generic arrangement" that *BASCOM* holds supplies an inventive concept, even if the underlying cryptographic primitives were individually known.

The prosecution history of the '410 patent independently confirms that the claimed combination was not conventional.  During examination, the USPTO subjected the application to rigorous prior art scrutiny.  In a first Non-Final Office Action dated December 3, 2012, the

Examiner rejected claims 1–15 under § 103(a) based on combinations of three prior art references (Alkhatib, Kyusojin, and Joseph). **Exhibit A.** A Final Rejection followed on June 24, 2013, raising additional grounds under §§ 102 and 112. **Exhibit B.** After the applicant filed a Request for Continued Examination and submitted amended claims, the Examiner issued a Non-Final Office Action on December 9, 2013 in which all claims were allowed over the prior art. **Exhibit C.** The Examiner expressly stated that "[t]he prior art does not disclose, teach or fairly suggest the claimed invention." A Notice of Allowance issued on April 17, 2014, and all twenty claims were allowed. **Exhibit D.** Notably, at no point during prosecution did the Examiner raise a § 101 rejection. The Examiner's determination that the prior art failed to disclose, teach, or suggest the claimed invention—after evaluating multiple references in combination is strong evidence that the specific methods and systems recited in the claims were not "well-understood, routine, and conventional" at the time of the invention. *See Berkheimer*, 881 F.3d at 1369 (whether elements are well-understood, routine, and conventional is a question of fact).

### F. *Berkheimer* Independently Bars Resolution of the Step Two Factual Questions on a Motion to Dismiss

BlackBerry's Step Two argument depends entirely on characterizing the claimed elements as "well-understood, routine, and conventional" based solely on the specification's statements that various encryption techniques "may" be used and that the invention is "not inherently related to any particular computer." Mot. at 12. Those statements address *implementation flexibility*; they do not establish that the specific combination and structural arrangement of the claimed elements was conventional in commercially deployed email systems as of 2004. The specification's silence on that specific point is not an admission that the combination was routine. *Berkheimer*, 881 F.3d at 1369.

---

A complaint need only allege facts sufficient to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Knossos's Amended Complaint does far more than satisfy that standard. It alleges that "[n]o prior systems combined registration-based participation controls, server-mediated membership determination, Internet-unroutable private routing addresses, transmission-specific symmetric key generation, formation of security packages using recipient-specific public keys, and server-hosted storage and retrieval operations in the manner recited in the claims." FAC ¶60. It further alleges that conventional systems "relied on publicly routable and mutable email addresses and content-only encryption that left routing and addressing information exposed," whereas the claimed architecture "implements a server-associated private domain that governs membership, controls routing through private-domain address structures, generates transmission-specific symmetric keys, forms security packages encrypted with recipient-specific public keys, and coordinates storage and retrieval within server-hosted databases." FAC ¶¶58-59. These are specific factual allegations about the state of the art that must be accepted as true at the pleading stage. BlackBerry labels them "conclusory," but an allegation that identifies five specific technical elements and asserts they were not previously combined is a factual assertion, not a legal conclusion. If BlackBerry contends that the claimed combination was routine and conventional, the appropriate vehicle is summary judgment supported by expert testimony or prior art evidence, not a Rule 12(b)(6) motion that asks the Court to resolve a disputed factual question against the patentee at the pleading stage. *Berkheimer*, 881 F.3d at 1368-69. BlackBerry's motion should be denied on Step Two independently on this ground. Knossos's 34-page FAC is not the threadbare pleading BlackBerry portrays. It contains a figure-by-figure walkthrough of the patent's technical architecture, FAC ¶¶29-44, claim-to-specification mapping tables spanning five pages that tie each limitation to specific column-and-line disclosures and figures (*id*. ¶¶51-52 (Tables 1-5)) and

detailed allegations explaining how the claimed combination differs from prior art approaches.  *Id.* ¶¶25-28 (identifying specific technical deficiencies in pull-based, web-based, and content-only encryption systems); ¶¶57-60 (alleging that the specific combination of five enumerated elements was not previously employed in conventional messaging systems).  BlackBerry's attempt to reduce these detailed technical allegations to "conclusory assertions" is itself conclusory.  At the pleading stage, the question is not whether BlackBerry finds the allegations persuasive, it is whether they are factual allegations that must be accepted as true.  Precedent dictates that they must be.

## CONCLUSION

For the foregoing reasons, BlackBerry's motion to dismiss should be denied.  The asserted claims of the '410 patent are directed not to the abstract idea of private messaging, but to a specific technical architecture incorporating private domain-based architecture and addresses, per-message unique symmetric encryption keys, and per-recipient public-key-protected security packages that solves a concrete technical deficiency in Internet messaging infrastructure, satisfying *Alice* Step One.  Even if they did not, the non-conventional combination of those elements constitutes an inventive concept under *Alice* Step Two, and BlackBerry has produced no evidence establishing that the specific combination was well-understood, routine, and conventional as of 2004.  In either event, the claims represent the type of specific technological improvement that *Enfish*, *BASCOM*, and *McRO* — and the computer-security-specific holdings in *Ancora*, *Finjan*, and *SRI Int'l* — hold to be patent-eligible subject matter.

Date: <u>March 31, 2026</u>                    Respectfully submitted,

<u>/s/ C. Matthew Rozier</u>

C. Matthew Rozier (CO 46854)*
**ROZIER HARDT MCDONOUGH PLLC**
1001 Bannock Street, Suite 241
Denver, Colorado 80204
Telephone: (404) 779-5305; (202) 316-1591
Email: matt@rhmtrial.com

James F. McDonough, III (GA 117088)*
**ROZIER HARDT MCDONOUGH PLLC**
659 Auburn Avenue NE, Unit 254
Atlanta, Georgia 30312
Telephone: (404) 564-1866
Email: jim@rhmtrial.com

Jonathan L. Hardt (TX 24039906)*
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite A
Austin, Texas 78701
Telephone: (210) 289-7541
Email: hardt@rhmtrial.com

Marie-Victoire Wickers (NY 5791645)*
**ROZIER HARDT MCDONOUGH PLLC**
25 Kent Ave lobby, Suite 401
Brooklyn, New York 11249
Telephone: (646) 648-0559
Email: wickers@rhmtrial.com

**Attorneys for *Plaintiff KNOSSOS GLOBAL SYSTEMS, LLC***

* Admitted to the Eastern District of Texas

<u>**Exhibits**</u>
A. 8,819,410 patent prosecution history: Non-Final Office Action (December 3, 2012)
B. 8,819,410 patent prosecution history: Final Rejection (June 24, 2013)
C. 8,819,410 patent prosecution history: Non-Final Office Action (December 9, 2013)
D. 8,819,410 patent prosecution history: Notice of Allowance (April 17, 2014)

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this day a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who are deemed to have consented to electronic service.

Date: <u>March 31, 2026</u>                    */s/ C. Matthew Rozier*

C. Matthew Rozier (CO 46854)