**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| KNOSSOS GLOBAL SYSTEMS LLC,<br>Plaintiff,<br>v.<br>BLACKBERRY LIMITED,<br>Defendant. | Civil Action No. 2:25-cv-01177-JRG-RSP<br>**JURY TRIAL DEMANDED** |

# SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Knossos Global Systems LLC ("Knossos" or "Plaintiff") files this second amended complaint against BlackBerry Limited ("BlackBerry" or "Defendant") alleging, based on its own knowledge as to itself and its own actions, and based on information and belief as to all other matters, as follows.

## NATURE OF THE ACTION

1. This is a patent infringement action against Defendant for infringement of the following United States Patent (the "Asserted Patent") issued by the United States Patent and Trademark Office ("USPTO"), copies of which are available as provided below:

| | U.S. Patent No. | Title | Available At |
|---|---|---|---|
| A. | 8,819,410 | Private Electronic Information Exchange | USPTO.GOV, https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/8819410 *see also* **Exhibit 1** |

2. Plaintiff seeks monetary damages for BlackBerry's infringement.

## PARTIES

3. Plaintiff is a limited liability company formed under the laws of Texas with a registered office address located in Austin, Texas (Travis County).

4. BlackBerry is a Canadian corporation organized under the laws of Canada with its principal place of business located at 2200 University Avenue East, Waterloo, Ontario, Canada N2K 0A7.

**JURISDICTION AND VENUE**

5. Plaintiff repeats and re-alleges the allegations in Paragraphs 1-4 as though fully set forth in their entirety.

6. This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, and 284-85, among others. This Court has subject matter jurisdiction of the action under 28 U.S.C. § 1331 and § 1338(a).

7. Venue is proper against Defendant in this District pursuant to 28 U.S.C. 1391(c)(3) because it does not reside in any judicial district in the United States. *See In re: HTC Corp.*, 889 F.3d 1349, 1354 (Fed. Cir. 2018).

8. Defendant is subject to this Court's specific and general personal jurisdiction under due process and/or the Texas Long Arm Statute due at least to Defendant's substantial business in this judicial District, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Texas and in this District.

9. Specifically, BlackBerry does business in this District and has committed acts of infringement in this District. BlackBerry offered its products or services, including those accused of infringement here, to customers and potential customers located in Texas, including in this District.

10. Based upon public information, BlackBerry owns, operates, advertises, and/or controls the website https://www.blackberry.com/ through which it advertises, sells, offers to sell, provides and/or educates customers about its products and services:




**Exhibit 2.**

11. The BlackBerry website lists the Defendant as the owner and operator of the website:




**Exhibit 3.**

12. BlackBerry conducts business in the Eastern District of Texas and offered, and continues to offer, products and services at all times relevant to the allegations herein. For example, and as depicted below, BlackBerry promotes, advertises, and provides its products and

services, including the products and services accused of infringing herein through its website:




**Exhibit 4.**

13. BlackBerry has repeatedly appeared as a party in this Court, including, for example, *Calibrate Networks LLC v. BlackBerry Limited*, No. 2:25-cv-00435 (E.D. Tex.); *AttestWave LLC v. BlackBerry Limited*, No. 2:24-cv-00929 (E.D. Tex.); *Liberty Patents LLC v. BlackBerry Limited, et al.*, No. 2:21-cv-00458 (E.D. Tex.); and *American Patents LLC v. TCL Corp., et al.*, No. 4:18-cv-00767 (E.D. Tex.). These matters reflect BlackBerry's history of litigating in this District and further confirm that this Court is a foreseeable and convenient forum for disputes concerning BlackBerry's products and services.

14. BlackBerry shipped and caused to be shipped into the District infringing products and materials instructing its customers, employees, exclusive and non-exclusive contractors, agents, and affiliates for installation, operation, and service, and thus performed infringing activities, at locations within the District.

15. Defendant committed acts of infringement from this District, including, but not limited to, use of the Accused Products.

## THE ACCUSED PRODUCTS

16. Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

17. Defendant used, caused to be used, sold, offered for sale, provided, supplied, or distributed its private information exchange services, including through its website, as shown in Dkt. No. 18 at 3.

18. Specifically, Defendant BlackBerry Limited used, caused to be used, sold, offered for sale, provided, supplied, or distributed its private electronic information exchange services, including but not limited to BlackBerry BBM Enterprise and BlackBerry Work (the "Accused Products"), as identified in Knossos's Disclosure of Asserted Claims and Infringement Contentions served under P.R. 3-1 on March 12, 2026, as may be amended (the "Infringement Contentions"), which are incorporated herein by reference.

## BLACKBERRY'S PRE-SUIT KNOWLEDGE

19. Beginning in May 2021, outside counsel for Knossos's predecessor-in-interest, Anon-X, Inc. ("Anon-X"), communicated directly with BlackBerry representatives Frank Geng and Derek Johnson, BlackBerry's Senior Patent Licensing Counsel, about BlackBerry's infringement of the Asserted Patent, U.S. Patent No. 8,819,410. Those communications included a claim chart showing how BBM Enterprise, one of the Accused Products, infringed the Asserted Patent. Mr. Johnson acknowledged on BlackBerry's behalf that BlackBerry had received the materials, and that BlackBerry had reviewed them.

20. BlackBerry has therefore had actual knowledge of the Asserted Patent, and of specific allegations that the Accused Products infringe it, since at least May 2021. BlackBerry nonetheless continued to use, sell, offer for sale, provide, and promote the Accused Products, which practice at least one claim of the Asserted Patent for the reasons detailed below.

**COUNT I: INFRINGEMENT OF U.S. PATENT NO. 8,819,410**

21. Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

22. The USPTO duly issued U.S. Patent No. 8,819,410 (hereinafter, the "'410 patent") on August 26, 2014, after full and fair examination of Application No. 13/607,417 which was filed on September 7, 2012. *See* **Exhibit 1,** '410 patent at 1.

23. Knossos owns all substantial rights, interest, and title in and to the '410 patent, including the sole and exclusive right to prosecute this action and enforce said patent against infringers and to collect damages for all relevant times.

24. The claims of the '410 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve upon the function and operation of private electronic communications.

25. The written description of the '410 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

**A. The Technical Problems in Private Electronic Communications in 2004.**

26. The specification of the '410 patent details the specific problems in private electronic communications in 2004. In the early 2000s, the Internet had become a "new form of commons" allowing for widespread global communication. Exhibit 1, '410 patent at 1:19-29. The protocol for sending email, SMTP (simple mail transport protocol), was simple and easy to implement. *Id.*

27. As the specification describes, however, those systems are "the equivalent of postcards readable by anyone watching them go by." *Id.* at 1:33-34. Specifically, encryption allowed for

the content of messages to be disguised but left everything "other than the content" publicly exposed. *Id*. at 1:40-43. In other words, conventional electronic mail systems, including those employing encryption, remained architecturally exposed because email addresses were publicly routable and mutable on the open Internet leading to exposure to spam, viruses, and fraud. *Id*. at 1:37-62.

28. Prior attempts to solve this issue included efforts to keep email addresses private by requiring that all messages be sent and received via a web browser connection to a particular server farm. *Id*. at 1:63-2:2. The specification describes this approach as a "pull email system" to which users have to log in to receive their email. *Id.* at 1:64-2:2. This worked if the recipient already had an email address within the system. *Id*. at 2:1-2. However, if users had email clients receive email (a "push" system), the addresses became public to reach the user. *Id*. at 2:3-5. The specification further explains that this could be addressed with a "solely-web-based email system" where "all communication between the user and the web site is via SSL, an encrypted link." *Id*. at 2:5-7.

29. However, this approach did not eliminate the underlying exposure problem and introduced additional limitations. When a message had to be delivered outside the web-based system, it still traveled via normal channels, making the address public. *Id*. at 2:7-10. And even where users maintained web-based accounts, email could remain in the inbox unread for an undetermined length of time, rendering it worthless if it had a time value. *Id*. at 2:10-15. The '410 patent solves these issues using the claimed methods and apparatuses.

### B. The '410 patent's Technical Solution: Electronic Information Transmission Within a Server-Associated Private Domain.

30. The claimed invention of the '410 patent relates to "methods and apparatuses for private electronic information exchange." *Id*. at 2:41-49. The specification describes a private-

domain transmission architecture implemented in a variety of technical ways within a server-associated private domain. *See, e.g.*, *id.* at 3:8-5:21. These technical solutions include using a private domain address to route information over a private domain within "electronic networks such as the Internet," *id.* at 4:9-14, using a "variety of encryption techniques" such as "RSA technologies" and "PGP (pretty good privacy) key pairs" to "encode private routing information within a private domain," *id.* at 4:19-23, 5:30-44, using email addresses that are "not standard email addresses used in the public accessible network," *id.* at 5:10-21, and an "apparatus for performing the operations" described by the patent. *Id.* at 4:62-5:29. The figures in the specification illustrate these concepts in more detail.

31. **Fig. 1**, below, depicts the "topology" of a system in which the private domain architecture is implemented:




**Fig. 1**, '410 patent.

32. The system includes a "variety of clients, such as, for example personal computers **101**, workstations, laptop computers, or tablets **102**, personal digital assistants **103**, cellular phone **104,** or any computerized device capable of running software and being connected to a network" as well as server farms, **106** and **107**. *Id*. at 5:25-32. The server farms, **106** and **107,** "contain databases that hold subscriber information, recipient information, message information, and documents." *Id*. at 5:33-37. Communication between the devices can be implemented using the Internet using protocols such as TCP/IP, ATM, SNA, and SDI (among others), *id*. at 5:38-57, or through intranet networks within organizations. *Id*. at 5:43-45; *see also id*. at 5:58-6:40 (detailing how devices and servers connected with each other). The client devices, in turn, are able to send and receive email messages from each other using proprietary and standard email systems, including those using POP3 (post office protocol 3), SMTP, or IMAP (Internet message access protocol) standards. *Id*. at 6:41-48.

33. In this system, the '410 patent is able to solve the then-existing technical problem resulting from spammers accessing email addresses and sending spam messages by using an "Internet unroutable address." *Id*. at 6:49-52. The '410 patent discloses several ways to create such an Internet unroutable address. First, the patent teaches using an address with a first portion of an address that is "compatible with a standard email address" and a second portion that is "privately recognizable" and enabled to route within a private network or private network community. *Id*. at 6:57-62.

34. Second, the '410 patent discloses using a private domain that "may be hosted by a dedicated server such as server farms **106** and **107**. *Id*. at 6:65-67. In such cases, the sender subscribes to the private network, logs into "at least one of the servers in the server farm **106** and **107**," and sends an email using a "privately routable address." *Id*. at 6:67-7:11. If the recipient is

a member of the private network, they may receive a message that the message is waiting to be retrieved. *Id*. at 7:43-52. If the recipient is not a member of the private domain, the server creates a temporary account for the recipient and "stores the security package in one or more locations temporarily allocated for the recipient." *Id*. at 55-56. In such cases, the server sends a notification message to the email address of the recipient to notify the recipient that the message is waiting for retrieval. *Id*. at 53-61.

35. In addition to the routing and server-mediated membership architecture described above, the '410 patent further structures each electronic information transmission as a distinct cryptographic unit. In one embodiment, "the email message is encrypted using a symmetrical key created specifically for that email message," such that "each email message is encrypted using a distinctive symmetrical key." *Id*. at 7:29-36. After encryption with the symmetric key, "the symmetrical key may be further encrypted to form a security package using a public key of a key pair associated with the recipient," and "[t]he public key may be received by the sender from a server of the private domain." *Id*. at 7:36-45. Thus, each transmission includes both encrypted electronic information and a corresponding "security package" containing an encrypted version of the symmetric key, which is stored within the private domain and later retrieved and decrypted by the recipient. *Id*. at 7:46-52; 8:17-24.

36. **Fig. 2** illustrates the structure of an electronic message within the private-domain architecture and how the invention solves issues related to the exposure of information to spammers and other bad actors. As shown, an exemplary electronic message includes a "document package" and a corresponding "security package." *Id.* at 8:26-29. The document package includes a document that "may be encrypted by a symmetrical key," and in one embodiment "symmetrical key **204** is generated by the sender … specifically for" that document. *Id.* at 8:29-42. The security

package includes that same symmetric key encrypted using a public key associated with the intended recipient. *Id.* at 8:43-53. The document package and security package may be stored within the server-hosted private domain and later retrieved by the recipient, who uses the recipient's private key to decrypt the symmetric key and then decrypt the document to recover the original electronic information. *Id.* at 8:54-64. **Fig. 2** is reproduced in its entirety, below:




**Fig. 2**

**Fig. 2**, '410 patent.

37. **Fig. 3** illustrates an exemplary software architecture implementing the private-domain electronic messaging system within a client device. The architecture includes an electronic messaging client add-in that operates in conjunction with a conventional electronic messaging client and a communication interface. *Id.* at 8:65-9:7. The electronic messaging client add-in includes both a receiving module and a transmitting module and is responsible for handling electronic message transmission and reception within the private-domain architecture. *Id.* at 9:8-20. In particular, the add-in "handles most of the address processes," including processing the first

and second portions of private routing addresses, and communicates with the underlying messaging client in a manner that is largely transparent to the user. *Id.* at 9:21-26. The communication interface enables the client and add-in to communicate with the server-hosted private domain over a network connection. *Id.* at 9:28-45. **Fig. 3** is reproduced in its entirety, below:




Fig. 3

**Fig. 3**, '410 patent.

38. **Figs. 4A** and **4B** illustrate the structural distinction between a conventional publicly routable email address (**Fig. 4A**) and a private routing address used within the private-domain architecture (**Fig. 4B**). Both figures are reproduced below:




Fig. 4A

**Fig. 4A,** ’410 patent.




Fig. 4B

**Fig. 4B**, ’410 patent.

39. **Fig. 4A** shows a typical email address, composed of a mailbox name **401** followed by an “@” sign, then a domain **402** (such as “yahoo” or “gmail”), and, finally, a top level domain (TLD) **403**, such as “.com” or similar. *Id.* at 9:54-61. By contrast, as illustrated in **Fig. 4B**, the private email address of the ’410 patent includes an additional “private top level domain” (“PTLD”) **404**, which may be used with or without a TLD. *Id.* at 9:60-10:3. Because the PTLD “is not a part of the registered set,” routing equipment and domain name servers of the open Internet “will not recognize the PTLD, denying its access for movement on the open Internet.” *Id.*

at 10:8-15. Routing of such private addresses therefore requires the server-associated private-domain infrastructure, which matches private addresses with their underlying public addresses and enables routing within the private network. *Id.* at 10:15-27. The sender must have an account in the private network in order to send or receive electronic information using the private routing address. *Id.*

40. **Fig. 5** further illustrates the structure of an electronic message within the private-domain system. An exemplary electronic message includes a message header **501** and a document **502**. *Id.* at 10:32-39. The message header **501** may include the identities of the sender and recipient, and in one embodiment at least one of those addresses includes a first portion and a second portion that enables routing within the private network. *Id.* at 10:39-46. The document **502** includes the message body and any attachments, and may include additional properties such as a checksum or document identifier. *Id.* at 10:46-49. Thus, the private-domain architecture operates on structured electronic messages that retain conventional header and body formats while incorporating routing and cryptographic constraints specific to the private domain.

41. **Fig. 6** illustrates an exemplary process for transmitting an electronic message within the private-domain architecture. *Id.* at 10:50-13:26. **Fig. 6** is reproduced below:




**Fig. 6**, '410 patent.

42. The process of **Fig. 6** is performed by a client and/or client add-in communicatively coupled to server farms **106** and **107** associated with the private domain. *Id.* at 10:52-11:6. The process, broken down into the blocks of **Fig. 6** are as follows:

a. At block **603**, a user initiates transmission by pressing "Send," which opens a TCP/IP socket connection at block **604**, and at block **605** the email client add-in opens an SMTP proxy process. *Id.* at 10:61-11:3.

b. At block **606,** the email client **302** starts "sending the message to the email client add-in **301**." *Id.* at 11:22-23. The client add-in **301** then processes message header information (block **607**), separates private routing addresses from standard addresses (block **608**), and initiates a secure network connection with the server (block **609**) to authenticate the sender. *Id.* at 11:18-51.

c. At block **610**, the server authenticates the sender by determining whether the sender has subscribed to the private domain, and at block **612** the server determines whether each recipient is a member of the private domain and locates the corresponding public keys. *Id.* at 11:52-67.

d. If a recipient is not a member, the server creates a temporary key pair (block **613**) and a table of recipient identifiers (block **614**). *Id.* at 11:67-12:14.

e. Meanwhile, at block **615**, the client add-in generates a unique symmetric key specifically for the message being sent, and encrypts at least a portion of the document using that symmetric key (block **616**), which is sent over the network to be stored (block **617**). *Id.* at 12:15-29.

f. At block **618**, the client encrypts the symmetric key using each recipient's public key and forms a corresponding security package, and the security packages are transmitted to and stored by the server such that no message or symmetric key is kept unencrypted (blocks **619-620**). *Id.* at 12:30-53.

g. The server logs statistical information at block **621**, may enforce transmission limits associated with subscription levels, and sends acknowledgements (blocks **622-624**). *Id.* at 12:50-13:4.

43. Once the procedure above has been completed, the server thereafter notifies the recipient that a message is available for retrieval, or the recipient may retrieve the message without notification. *Id.* at 13:5-12. If the recipient is not yet a member of the private domain, the server sends a notification to the recipient's standard email address and may provide a mechanism for downloading application software to enable receipt within the private domain. *Id.* at 13:9-26.

44. **Fig. 7** illustrates the corresponding process for receiving an electronic message within the private-domain architecture. *Id.* at 13:27-35. The process, broken down into the blocks of **Fig.**

**7** are as follows:

**a.** At block **703**, a user initiates retrieval by selecting "receive" in the email client, which opens a POP or IMAP request and establishes a TCP/IP socket connection with the server associated with the private domain (blocks **704-705**). *Id.* at 13:36-45.

**b.** At block **706**, the client transmits identifying information (e.g., username and password) to the server, and the server authenticates the recipient by checking its user database and, in certain embodiments, additional machine signature information (block **707**). *Id.* at 13:46-55.

**c.** Upon successful authentication, the client requests available messages at block **708**, the server determines whether mail exists at block **709**, and builds and transmits a list of message identifiers at block **710**. *Id.* at 13:56-14:4.

**d.** The client then requests individual messages at blocks **712-713**, and the server retrieves and transmits the corresponding security package containing the encrypted symmetric key. *Id.* at 14:4-12.

**e.** At block **715**, the client decrypts the encrypted symmetric key using the recipient's private key, and at blocks **716-717** retrieves and decrypts the encrypted document using that symmetric key. *Id.* at 14:12-21.

**f.** The decrypted document is delivered to the email client at block **718**, and message retrieval continues at blocks **720-722** until all available messages are processed. *Id.* at 14:21-33.

45. The specification further describes embodiments in which senders and recipients are bound together by the server such that their addresses are readable and routable only by that server, and in which transmission limits and subscription controls govern participation within the private domain. *Id.* at 15:6-29.




**Fig. 7,** ’410 patent.

46. **Fig. 8** illustrates an exemplary digital processing system that may implement the client devices and server farms described above. *Id.* at 15:30-38. The system includes a bus **802**, microprocessor **803**, ROM **807**, a volatile RAM **805**, non-volatile memory **806**, input/output interfaces typical of a data processing system **810**. *Id.* at 15:39-16:9. In one embodiment, the email client and/or client add-in implementing the private-domain architecture may reside in volatile memory and execute on such a processing system to exchange electronic information using

a privately routable address. *Id.* at 16:10-17. The specification explains that these components may be arranged in various configurations and are not limited to any particular hardware architecture. *Id.* at 15:34-38; 16:18-32. **Fig. 8** is reproduced below:




**Fig. 8**

## C. The Claims of the ’410 Patent Provide Technical Solutions to the Problems in Private Electronic Communication Identified in 2004.

### *1. The Claims of the ’410 Patent.*

47. The ’410 patent contains 20 total claims (two independent and eighteen dependent). Claim 1 and certain of its dependent claims and claim 20 are set forth below. However, this is not an admission that claim 1 or claim 20 is representative of all claims of the ’410 patent. Each of the remaining claims recites additional concrete technical steps and system configurations that further implement the private-domain routing, server-mediated membership determination,

transmission-specific symmetric key generation, security-package formation, authentication controls, and routing-address structures described in the specification, and demonstrate how the invention addressed technical problems associated with publicly routable electronic messaging systems. For clarity, bolding and italics are used to highlight where the claims capture the technical mechanisms disclosed in the specification, as shown below:

1. A method, comprising:

> ***registering a sender to enable the sender to access services of a private domain in order to allow the sender to use the private domain for electronic information transmissions between members of the private domain***;
>
> receiving, at a server associated with the private domain, data from the sender indicating that the sender is initiating the transmission of electronic information in the private domain to a recipient;
>
> ***determining, at the server associated with the private domain, whether the recipient is a member of the private domain by examining a record of members of the private domain***;
>
> ***providing to the sender, from the server associated with the private domain, a public cryptographic key associated with the recipient when the recipient is determined to be a member of the private domain***;
>
> receiving, at the server associated with the private domain, electronic information to be delivered to a recipient from the sender, ***the electronic information comprises at least a portion of the electronic information encrypted by a symmetric cryptographic key that is unique for the transmission of the electronic information, and wherein the electronic information further comprises a security package that contains an encrypted version of the symmetric cryptographic key, the encrypted version of the symmetric cryptographic key encrypted by the sender using the public cryptographic key of the recipient to enable the recipient to decrypt the symmetric cryptographic key and then decrypt the at least a portion of the encrypted electronic information***; and
>
> transmitting the electronic information, with the security package, over an electronic network to the recipient.
>
> 5. The method of claim **1**, wherein ***the format of the private routing***

> ***address contains one or more characters that are discretionarily selectable by an administrator of the private domain***.
>
> 6. The method of claim **5** wherein ***the private routing address includes a first portion and a second portion, wherein the first portion comprises a sequence of characters that are compatible with a public domain and are publicly routable over the public domain of the network, and the second portion comprises a different sequence of characters that are not compatible with the public domain of the network but are routable within the private domain of the network, wherein the private routable address as a whole is not routable within the public domain of the network***.
>
> 7. The method of claim **1**, ***wherein the private routing address includes a Private Top Level Domain (PTLD)***.
>
> 15. The method of claim 1, further comprising:
>
> when the recipient is determined not to be a member of the private domain, ***creating a temporary entry for the recipient within the database if the recipient is not found within the database to allow the recipient to receive the electronic information after obtaining software that enables the recipient to download the electronic information from the private domain, without the sender re-sending the electronic information***.

’410 patent, Claims 1, 5-7, 9, 10, and 15.

48. The other independent claim, claim 20, claims an apparatus in the form of a “non-transitory computer readable storage medium that provides instructions, which when executed on a processing system, cause the system to perform” the method steps as described in claim 1. Thus, claim 20 claims the same private-domain transmission architecture in computer-readable medium form.

49. The dependent claims of the ’410 patent impose additional technical constraints that further implement and refine the private-domain transmission architecture recited in claim 1. For example, as shown above, claims 5-7 specify structural requirements for the format of the private routing address, including embodiments in which the address contains characters selectable by an administrator (claim 5), a first portion compatible with a public domain and a second portion

routable only within the private domain (claim 6), and where the private routing address incorporates a Private Top Level Domain ("PTLD") (claim 7). Claim 9 recites conditional routing logic in which electronic information may be transmitted using publicly routable addresses without modifying the content when the recipient address is not a private routing address, thereby defining different routing behavior based on address type. Claim 10 further recites server-mediated storage and retrieval when the recipient address is a private routing address, requiring that the electronic information be transmitted to and retrievable from the server associated with the private domain. Claim 15 adds a distinct database-management mechanism in which, if a recipient is not a member of the private domain, a temporary entry is created to allow the recipient to obtain software and retrieve the electronic information without requiring the sender to retransmit it. Collectively, these dependent claims impose additional routing, database, and transmission-control constraints beyond those recited in claim 1. And as shown above, these dependent claims capture the various technical mechanisms that implement, refine, and extend the private electronic message routing disclosed in the '410 patent.

50. Given the differences described among the claims, claim 1 cannot be treated as representative of the asserted claims of the '410 patent. The dependent claims recite materially different routing structures, database-management operations, conditional transmission logic, and server-mediated control mechanisms that alter how electronic information is registered, routed, stored, authenticated, and retrieved within the private domain. These limitations impose additional architectural constraints beyond those recited in claim 1 and define distinct operational behaviors within the private-domain transmission system. Accordingly, the remaining claims encompass technical implementations not fully reflected in claim 1 alone.

### 2. *How the Claims of the '410 Patent Implement the Invention.*

51. As reflected in the specification and the claims set forth above, the '410 patent is

directed to a structured private-domain transmission architecture in which registration, server-side membership determination, routing constraints, transmission-specific cryptographic packaging, and controlled storage and retrieval operate together to govern how electronic information is exchanged within the private domain. The claims do not merely recite the transmission of information over a network, but instead define a coordinated system that constrains participation, routing behavior, key management, and message handling at multiple architectural layers.

52. The disclosures in the specification are specifically implemented by the claims as shown in the tables below:

**Table 1: Claim 1 Mapped to Specification**

| Claim 1 | Citation |
|---|---|
| 1. A method comprising: | N/A |
| registering a sender to enable the sender to access services of a private domain in order to allow the sender to use the private domain for electronic information transmissions between members of the private domain; | **6:65-7:11** (Sender subscribes to private network and logs into server before sending email) |
| receiving, at a server associated with the private domain, data from the sender indicating that the sender is initiating the transmission of electronic information in the private domain to a recipient; | **11:18-51** (Client add-in initiates secure connection and transmits identifying information to server)<br><br>**Fig. 6,** blocks **606-609** |
| determining, at the server associated with the private domain, whether the recipient is a member of the private domain by examining a record of members of the private domain; | **11:52-67** (Server authenticates sender and determines whether each recipient is a member)<br><br>**Fig. 6,** blocks **610-612** |
| providing to the sender, from the server associated with the private domain, a public cryptographic key associated with the recipient when the recipient is determined to be a member of the private domain; | **12:10-14** (Server maintains recipient public keys and creates temporary key pairs if needed)<br><br>**Fig. 6,** block **614** |
| receiving, at the server associated with the private domain, electronic information to be delivered to a recipient from the sender, the electronic information comprises at least a portion of the electronic information encrypted by a symmetric cryptographic key that is | **7:29-45; 8:26-53; 12:15-53** (Symmetric key created specifically for each message; document encrypted using that key; symmetric key encrypted using recipient's public key to form a security package; document package and security package transmitted to and stored |

| Claim 1 | Citation |
|---|---|
| unique for the transmission of the electronic information, and wherein the electronic information further comprises a security package that contains an encrypted version of the symmetric cryptographic key, the encrypted version of the symmetric cryptographic key encrypted by the sender using the public cryptographic key of the recipient to enable the recipient to decrypt the symmetric cryptographic key and then decrypt the at least a portion of the encrypted electronic information; and | by server)<br><br>**Fig. 2** (disclosing document package, security package, symmetric key, and encryption layering)<br><br>**Fig. 6,** blocks **615-620**<br><br>**Fig. 7,** blocks **714-717** |
| transmitting the electronic information, with the security package, over an electronic network to the recipient. | **5:23-37; 13:5-12; 14:4-21; 12:30-53** (Security packages transmitted over network connection to server and stored; server notifies recipient; security package transmitted to recipient; recipient retrieves and decrypts document; transmission occurs within server-hosted private domain architecture)<br><br>**Fig. 1**<br><br>**Fig. 6,** blocks **619-620**<br><br>**Fig. 7,** blocks **714-718** |

**Table 2: Claim 5 Mapped to Specification**

| Claim 5 | Citation |
|---|---|
| 5. The method of claim 1 , wherein the format of the private routing address contains one or more characters that are discretionarily selectable by an administrator of the private domain. | **6:49-56; 10:3-6; 10:15–27** (Private email address may be any string of characters so long as the server farms and client add-ins can route it; routing is dependent upon private-domain infrastructure rather than public domain name server recognition) |

**Table 3: Claim 6 Mapped to Specification**

| Claim 6 | Citation |
|---|---|
| 6. The method of claim **5** wherein the private routing address includes a first portion and a second portion, wherein the first portion | **6:57-64; 9:21-26** (disclosing the claimed first portion and second portion of the address) |

| | |
|---|---|
| comprises a sequence of characters that are compatible with a public domain and are publicly routable over the public domain of the network, and the second portion comprises a different sequence of characters that are not compatible with the public domain of the network but are routable within the private domain of the network, wherein the private routable address as a whole is not routable within the public domain of the network. | |

**Table 4: Claim 7 Mapped to Specification**

| Claim 7 | Citation |
|---|---|
| 7. The method of claim 1, wherein the private routing address includes a Private Top Level Domain (PTLD). | **9:62-67; 10:1-31** (private email address includes a "private top level domain (PTLD)" that is not part of the registered set; open Internet routing equipment will not recognize the PTLD, denying its access for movement on the open Internet)<br><br>**Fig. 4B** |

**Table 5: Claim 15 Mapped to Specification**

| Claim 15 | Citation |
|---|---|
| 15. The method of claim 1, further comprising: | N/A |
| when the recipient is determined not to be a member of the private domain, creating a temporary entry for the recipient within the database if the recipient is not found within the database to allow the recipient to receive the electronic information after obtaining software that enables the recipient to download the electronic information from the private domain, without the sender re-sending the electronic information. | **7:55-63; 11:67-12:14; 13:9-26** (server creates temporary account and key pair for non-member recipient; security package stored; notification sent; recipient may download software to retrieve message without requiring retransmission)<br><br>**Fig. 6,** blocks **613, 614** |

53. These mappings demonstrate that the claimed steps correspond to identifiable architectural and operational mechanisms implemented within a server-associated private-domain messaging system, including registration and authentication procedures, server-side membership determination, structured routing constraints, transmission-specific symmetric key generation, security-package formation, and controlled storage and retrieval of encrypted content. Taken

together, the mappings illustrate that the claims encompass a coordinated set of routing, database, cryptographic, and transmission-control operations that operate at multiple layers of the private-domain system, providing a fuller picture of the scope of the invention disclosed in the '410 patent.

***3. The Claims of the '410 Patent Are Not Abstract.***

54. These claims are directed to far more than any purported "abstract idea," and they do not merely recite the abstract concept of "sending secure email" or "encrypting messages over a network." Instead, the claims of the '410 patent are directed to a specific server-associated private-domain transmission architecture that implements structured routing, membership gating, and transmission-specific cryptographic packaging to address technical problems associated with publicly routable electronic messaging systems. As shown in the patent specification, the Figures, and the claim language, the invention implements a particular configuration of server-side registration and authentication logic, private routing address structures that are not publicly routable, per-transmission symmetric key generation, security-package formation using recipient-specific public keys, and coordinated storage and retrieval operations within the private domain. These coordinated mechanisms operate together to constrain how electronic information is registered, routed, encrypted, stored, and retrieved within the private-domain system, rather than simply applying generic encryption to conventional email transmission.

55. The claims of the '410 patent, including, but not limited to, claims 1, 5-7, 15, and 20, are directed to a technical solution to concrete technical problems that existed in publicly routable electronic messaging systems at the time of the invention. More specifically, the claimed subject matter addresses problems arising from the exposure of publicly routable email addresses, the inability to control routing behavior within open Internet infrastructure, the lack of server-mediated membership gating, and the absence of transmission-specific cryptographic packaging in conventional messaging systems. The '410 patent solves these problems through specific server-

side and client-side mechanisms that implement a private-domain routing architecture, require registration and authentication within that private domain, structure electronic information transmissions using symmetric cryptographic keys unique to each transmission, form corresponding security packages encrypted with recipient-specific public keys, and coordinate storage and retrieval operations through server-hosted databases. These coordinated operations constrain participation, routing, key management, and message handling within the private-domain system, thereby improving how electronic information is routed, secured, and retrieved within the networked environment described in the specification.

56. Additionally, these claims are not directed to subject matter that can be performed mentally or with pen and paper. The claims of the '410 patent, including claims 1, 5-7, 15, and 20, require specific server-side and client-side operations operating within a defined private-domain configuration, including registration and authentication procedures, server-mediated membership determination, generation of transmission-specific symmetric cryptographic keys, formation of security packages using recipient-specific public keys, structured routing through private-domain addresses, and coordinated storage and retrieval of encrypted electronic information. A human cannot generate and manage asymmetric and symmetric cryptographic key pairs for each transmission, cannot perform server-side database lookups to determine membership status, cannot dynamically create temporary key pairs and database entries for non-member recipients, and cannot route Internet-unroutable addresses through private-domain infrastructure using mental steps or pen and paper. These functionalities depend on networked server systems, client-side messaging software and add-ins, cryptographic key-generation routines, secure socket connections, and database-controlled routing logic operating together within the architecture described in the specification. The claimed subject matter therefore requires specialized

networked computing systems configured to perform coordinated cryptographic, routing, and authentication operations within the private-domain environment.

57. Finally, because of this specificity, the claims of the ’410 patent do not preempt all ways of transmitting electronic information securely over a network. The claims are confined to a particular private-domain architecture that requires registration-based participation, server-mediated membership determination, transmission-specific symmetric key generation, security-package formation using recipient-specific public keys, and routing through private-domain address structures that are not recognized by public domain name servers. Numerous alternative electronic messaging architectures were known at the time, including conventional publicly routable email systems employing standard SMTP, POP3, or IMAP protocols, web-based messaging platforms, and generic content-encryption schemes that did not incorporate server-mediated private routing domains, transmission-specific key packaging, or membership-gated address structures. Such alternative systems would not practice the coordinated private-domain routing and cryptographic packaging mechanisms recited in the claims of the ’410 patent. *See* ’410 patent at 1-2, References Cited (listing prior art patents and applications considered by the examiner or referenced during prosecution).

### *4. The ’410 Patent Claims Are Directed to Inventive Concepts.*

58. Even if the claims of the ’410 patent were characterized at a high level of abstraction (and the specification demonstrates that they are not), the claims recite subject matter that reflects a nonconventional and coordinated arrangement of technical mechanisms. The claimed system does not merely encrypt electronic messages; it restructures the routing architecture of electronic communications by requiring transmission through a server-associated private domain using addresses that are not routable on the public Internet.

59. To the extent that the claims employ components and techniques that were known at

the time, such as servers, email clients, cryptographic algorithms, and network connections, those elements are combined here in a manner that was not routine, conventional, or generic in publicly routable electronic messaging systems. In particular, the coordinated use of registration-based participation controls, server-mediated membership determination, transmission-specific symmetric key generation, formation of security packages using recipient-specific public keys, private-domain routing addresses not recognized by public domain name servers, and server-hosted storage and retrieval operations represents a specific architectural configuration that had not previously been employed together in conventional email systems. The specification explains that traditional systems relied on publicly routable email addresses and content-only encryption schemes that left routing and address information exposed, whereas the claimed architecture constrains routing behavior, key management, and message handling within a defined private domain. The claimed arrangement therefore reflects a particular and nonconventional configuration of networked computing components and cryptographic operations rather than the application of generic encryption to standard email transmission.

60. The specification explains that conventional electronic mail systems relied on publicly routable and mutable email addresses and content-only encryption that left routing and addressing information exposed. *Id.* at 1:33-62. By contrast, the claimed architecture implements a server-associated private domain that governs membership, controls routing through private-domain address structures, generates transmission-specific symmetric keys, forms security packages encrypted with recipient-specific public keys, and coordinates storage and retrieval within server-hosted databases. These coordinated mechanisms differ from the publicly routable messaging systems described in the specification and reflect a specific private-domain configuration not present in those conventional systems.

61. Even if that were not the case, the ordered combination of limitations in the claims of the ’410 patent, as recited and described above, was not well known or routine in publicly routable electronic messaging systems at the time of the invention. The interaction among these limitations, as depicted in **Figs. 1-7**, reflects a coordinated server-side and client-side transmission procedure that did not exist in conventional email systems and was not part of any generic or routine implementation. No prior systems combined registration-based participation controls, server-mediated membership determination, Internet-unroutable private routing addresses, transmission-specific symmetric key generation, formation of security packages using recipient-specific public keys, and server-hosted storage and retrieval operations in the manner recited in the claims. Rather than merely applying encryption to standard email protocols, the claims recite a specific sequence of routing, authentication, key-management, packaging, and database operations that use networked computing components in a coordinated and technically distinct manner to address problems associated with publicly routable messaging systems.

62. For these reasons, the claims of the ’410 patent recite a specific and coordinated combination of architectural and operational elements that define a concrete private-domain transmission system in both structure and operation.

**D. BlackBerry’s Infringement.**

63. Defendant directly infringed one or more claims of the ’410 patent by using, providing, supplying, or distributing the Accused Products.

64. Defendant directly infringed, either literally or under the doctrine of equivalents, at least claim 1 of the ’410 patent, as detailed in the Infringement Contentions.

65. For example, as detailed in the Infringement Contentions, the Accused Products performed a method comprising: registering a sender to enable the sender to access services of a private domain in order to allow the sender to use the private domain for electronic information

transmissions between members of the private domain; receiving, at a server associated with the private domain, data from the sender indicating that the sender is initiating the transmission of electronic information in the private domain to a recipient; determining, at the server associated with the private domain, whether the recipient is a member of the private domain by examining a record of members of the private domain; providing to the sender, from the server associated with the private domain, a public cryptographic key associated with the recipient when the recipient is determined to be a member of the private domain; receiving, at the server associated with the private domain, electronic information to be delivered to a recipient from the sender, the electronic information comprises at least a portion of the electronic information encrypted by a symmetric cryptographic key that is unique for the transmission of the electronic information, and wherein the electronic information further comprises a security package that contains an encrypted version of the symmetric cryptographic key, the encrypted version of the symmetric cryptographic key encrypted by the sender using the public cryptographic key of the recipient to enable the recipient to decrypt the symmetric cryptographic key and then decrypt the at least a portion of the encrypted electronic information; and transmitting the electronic information, with the security package, over an electronic network to the recipient.

**E. BlackBerry's Indirect Infringement.**

66. Indirect Infringement. From at least May 2021 until the '410 patent expired, BlackBerry also indirectly infringed one or more claims of the '410 patent, including at least claim 1, by inducing others to directly infringe in violation of 35 U.S.C. § 271(b) and by contributing to infringement in violation of 35 U.S.C. § 271(c).

67. Underlying Direct Infringement by End Users. For purposes of indirect infringement, the direct infringers were BlackBerry's customers and end users of the Accused Products. Each end user who used BBM Enterprise to send a protected message or attachment to a BBM Enterprise

contact, or who used BlackBerry Work to send a signed and encrypted email message, performed each and every step of the claimed methods, as set forth in the Infringement Contentions. BlackBerry's own documentation describes the end-to-end encryption of messages between BBM Enterprise users and the steps the device performs when a user sends a message, and it instructs BlackBerry Work users to tap "Set Security" and "Sign and encrypt message." Each customer that deployed the Accused Products did so together with the enterprise servers and infrastructure with which BlackBerry designed and instructed the Accused Products to operate, including the customer's BlackBerry UEM and mail servers and, where deployed, BEMS. For example, when a BlackBerry Work user taps "Sign and encrypt message" and sends the message, **BlackBerry Work retrieves the recipients' certificates from BEMS and Microsoft Exchange and then sends the encrypted email message. That certificate lookup draws on the organization's own directory, such as Microsoft Active Directory, which is the private domain's record of its members**. To the extent BlackBerry contends that certain claim steps were performed by third-party components with which the Accused Products operate, such as Microsoft Exchange, this does not defeat the underlying direct infringement. BlackBerry designed, built, and deployed the Accused Products, including their deliberate integration with Microsoft Exchange. **BlackBerry Work, not Microsoft Exchange, initiates the certificate retrieval**, and it does so only when the user selects "Sign and encrypt message" and sends the message. On information and belief, BlackBerry's software also dictates how those certificates are used to encrypt the message and when the encrypted message is sent, and Microsoft Exchange plays no role in the claimed methods until BlackBerry's software directs it. And to the extent any step of the claimed methods was performed by such infrastructure rather than by BlackBerry, that step was performed by or on behalf of the customer, which directed and controlled its own infrastructure and therefore

performed every step of the claimed methods.

68. BlackBerry knew of the ’410 patent no later than May 2021, as described in Paragraphs 19 and 20, above. BlackBerry also knew by then that its customers’ and end users’ use of BBM Enterprise infringed the ’410 patent, because the materials BlackBerry received and reviewed included a claim chart showing how BBM Enterprise infringed. BlackBerry likewise knew, or at minimum believed there was a high probability, that its customers’ and end users’ use of BlackBerry Work infringed the ’410 patent. Like BBM Enterprise, BlackBerry Work is a BlackBerry secure enterprise communications product that encrypts messages exchanged between users within an enterprise. Having received and reviewed a claim chart applying the ’410 patent to its encrypted enterprise messaging, BlackBerry continued to promote and support BlackBerry Work for encrypted enterprise communications through the expiration of the ’410 patent. In the alternative, BlackBerry was willfully blind to the fact that the use of BlackBerry Work infringed the ’410 patent, because it subjectively believed there was a high probability of such infringement and deliberately chose not to investigate whether BlackBerry Work practiced the ’410 patent.

69. Induced Infringement. BlackBerry induced its customers and end users to directly infringe the ’410 patent by downloading, activating, and using the Accused Products. BlackBerry actively encouraged and instructed users to perform the claimed methods through: (1) publicly available instructional materials, including a video demonstrating how to activate BBM Enterprise with the user’s email address and activation password, and BBM Enterprise documentation on docs.blackberry.com instructing users to enter their BlackBerry ID email address and password, tap “Sign in,” and tap “Continue”; (2) BBM Enterprise documentation, including BlackBerry’s publicly available BBM Enterprise Security Note, describing how BBM Enterprise encrypts and signs each message a user sends to another BBM Enterprise user, and support materials telling

users that BBM Enterprise provides "an enterprise-grade layer of encryption" for "[m]essages, attachments, voice and video calls between users"; (3) BlackBerry Work user guides that instruct users to tap "Set Security," tap "Sign and encrypt message," and send the message, **after which BlackBerry Work retrieves the recipients' certificates and sends the encrypted email message**; **(4) administrator guides that instruct customers to set up S/MIME for BlackBerry Work, including selecting the encryption algorithm and whether emails must be signed and encrypted**; and (5) advertising and promotional materials, including its website, https://www.blackberry.com/, its BBM Enterprise datasheet, and its Google Play listing showing a "Protected" BBM Enterprise chat with a file attachment, all touting the private messaging and encryption features of the Accused Products (*see* Dkt. No. 18 at 3–4), together with technical support for the Accused Products. BlackBerry performed these acts with knowledge of the '410 patent and with knowledge that the encouraged acts constituted infringement.

70. Contributory Infringement. BlackBerry also contributed to the direct infringement of one or more claims of the '410 patent by its customers and end users. BlackBerry offered to sell, sold, and supplied the Accused Products, including the secure messaging, encryption, and key-handling components of the BBM Enterprise and BlackBerry Work client software and related server-side services, knowing that these products were especially made and adapted to perform the claimed methods.

71. Those components constituted a material part of the claimed inventions, were especially made or especially adapted for use in infringing the '410 patent, and had no substantial non-infringing use. Their sole purpose was to obtain recipient cryptographic keys within the customer's private domain and to encrypt and package electronic information for transmission to members of that domain, as set forth in the Infringement Contentions. BlackBerry knew as much

no later than May 2021.

### F. BlackBerry's Willful Infringement.

72. BlackBerry's infringement of the '410 patent was willful. As alleged in Paragraphs 19 and 20 above, after receiving notice of the '410 patent and the infringement allegations in May 2021 and reviewing those materials, BlackBerry deliberately continued to use, sell, offer for sale, provide, and promote the Accused Products. On information and belief, BlackBerry did so without seeking a license and without changing the Accused Products to avoid infringement.

73. BlackBerry's willful infringement entitles Knossos to enhanced damages of up to three times the amount found or assessed under 35 U.S.C. § 284. It also supports a finding that this is an exceptional case and an award of Knossos's reasonable attorneys' fees under 35 U.S.C. § 285.

74. Knossos or its predecessors-in-interest satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of one or more claims of the '410 patent.

75. Knossos has been damaged as a result of the direct and indirect infringing conduct by Defendant alleged above. Thus, Defendant is liable to Knossos in an amount that compensates it for such infringements, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Because Defendant's infringement was willful, Knossos is also entitled to enhanced damages of up to three times the amount found or assessed under 35 U.S.C. § 284.

## JURY DEMAND

76. Knossos hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

77. Knossos requests that the Court find in its favor and against Defendant, and that the Court grant Knossos the following relief:

a. Judgment that one or more claims of the Asserted Patent have been infringed, directly and indirectly, either literally or under the doctrine of equivalents, by Defendant or others acting in concert therewith, and that such infringement was willful;

b. Judgment that Defendant accounts for and pays to Knossos all damages to and costs incurred by Knossos because of Defendant's infringing activities and other conduct complained of herein, including enhanced damages of up to three times the amount found or assessed under 35 U.S.C. § 284;

c. Pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein;

d. That this Court declare this an exceptional case and award Knossos its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

e. All other and further relief as the Court may deem just and proper under the circumstances.

Dated: October 8, 2026

Respectfully submitted,

By: */s/ C. Matthew Rozier*

James F. McDonough, III (GA 117088) *
**ROZIER HARDT MCDONOUGH PLLC**
659 Auburn Avenue NE, Unit 254
Atlanta, Georgia 30312
Telephone: (404) 564-1866
Email: jim@rhmtrial.com

C. Matthew Rozier (CO 46854) *
**ROZIER HARDT MCDONOUGH PLLC**
1500 K Street, 2nd Floor
Washington, DC 20005
Telephone: (202) 316-1591
Email: matt@rhmtrial.com

Jonathan L. Hardt (TX 24039906) *
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite A
Austin, Texas 78701
Telephone: (210) 289-7541
Email: hardt@rhmtrial.com

**Attorneys for *Plaintiff KNOSSOS GLOBAL SYSTEMS LLC***

* admitted to the Eastern District of Texas

**List of Exhibits**

1. U.S. Patent No. 8,819,410
2. Webpage: BlackBerry Home Page
3. Webpage: BlackBerry Website Ownership Information
4. Webpage: BlackBerry Products and Services

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this day a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service.

Dated: October 8, 2026

By: */s/ C. Matthew Rozier*
C. Matthew Rozier